In the case of the three that we have today, number 17-1480, In Re Google Inc. Cookie Placement Consumer Privacy Litigation, Messrs. Frank and Skinner, and then Messrs. Strange and Weibel. Is it Weibel or Weibel? Weibel. Weibel. Put the impostos in the wrong syllable. Thank you. May it please the court, Ted Frank for the appellant. I'd like to reserve six minutes for rebuttal. That's all right. Before we start with the two threshold questions that were asked of us regarding jurisdiction. The first one was regarding whether... Could you lift the microphone and speak to it? Thank you. The first one was whether... I'm not sure it's working. Since we invited you here, we want to make sure you can hear. No, it's just like hockey. You can't stop talking. I mean soccer, I should say. I don't want to get injured. Yeah, but you don't want to get injured. It'll be a soccer injury. Someone from Google want to help us with the technology? Technology. I guess the idea is speak up. I'll try to be louder. Starting with the first question the court raised regarding whether the consent decree created mootness. And we think the answer there is no. Because the complaint alleged and sought damages. That's at page 124 of the appendix. And then the settlement waived class members' rights to damages. That's at pages 130 and 135 of the appendix. And money is being paid as part of the settlement. And money is being paid as part of the settlement. It's just not to the class. So while this comes to the court as a B-2 class certification, it's really in every way a B-3. The class gets to opt out. Damages claims are being waived. Money is being waived. Where does that take you? Well, it goes to show that the B-3 standards apply across the board. So whatever this court says regarding whether B-2 has easier certification standards than B-3, that's not so here. So, for example, even Shelton said the ascertainability requirements do not apply to B-2. It said even there that if there were opt-out opportunities, then the ascertainability requirement would come back in. But the only error that you raised on appeal regarding class certification had to do with feasibility. You didn't say this is improperly designated a B-2 or B-3, did you? No. And that's not our argument. We're just raising the issue that there are two possibilities here. Either it was feasible to distribute the money to the class, in which case the stipe rate was improper. But it was not feasible to distribute the money to the class when the class certification was improper. Let's get to the issue of the direct benefit, which seems to be the hallmark of what we should be looking at. Do you not agree with Judge Posner in Hugh's case when he said that instead of giving everyone $3.90, isn't it better from the standpoint of CPRE to actually put money towards what they want to happen here, and that is to police and to not let this happen again? Isn't that more of a direct benefit to the class? No. Well, first of all, that it would be an indirect benefit rather than a direct benefit. A very definition of direct benefit is actually money going to the class. But this isn't a money case. This isn't like baby products where people on average were out $50. We don't know what the damages are. That wasn't part of the record. But it's worth noting that immediately after Hughes, Judge Posner in Pearson v. MBTY, 772 at third, came to me when there was a pot of money for the class, said it's not enough to say it's too hard to distribute the $1.1 million, even though there are 13 million class members. You can find a way to do it. You can have the class members' names get that money out there. And Hughes was a case where the statutory damages and the statutory damages were capped at $10,000. And the defendant just called and said, here's our $10,000. Get us out of the litigation. So is it your position that there could never be a CPRA-only settlement, that because of the availability of, hypothetically, of a lottery or claims-made procedure, that those must be resorted to? We take that position. The court doesn't have to reach that position. I think because of the availability of the lottery, I would call that preferable. That's not before us here because we have a district court that did not undertake the determination of how many class members there were compared to a case like Braley or Carrier on Hughes or the other cases that we provided in the district court on pages 183 and 184 of the appendix that demonstrated that it would be feasible to distribute money to class. But even in those cases, they didn't require it. In Google Refer, the Ninth Circuit made clear that it was not required, even if there were alternatives available. Google Refer certainly disagrees with us, but more importantly disagrees with Baby Products. Google Refer took the position that an appellate court has no business deciding whether to prefer a side CRA over a class recovery, and therefore they're not going to second-guess class counsel's decision there. But Baby Products doesn't knock side CRA completely out of the park, does it? That's correct. I mean, you can still have it in certain circumstances. It just didn't fit there. So when do you—you're writing this opinion—when do you think side CRA is available, and when do you think it should not be available? Well, for example, I think if you have $30,000 left over in the Baby Products distribution after they distributed $18 million to the class, that $30,000 is too hard, too infeasible to distribute to the rest of the class. It's a matter of numbers? It's absolutely a matter of numbers, because that's what feasibility is. Is it feasible to distribute to the class? But isn't it a matter, as we said in Baby Products, of whether the whole settlement is fair and reasonable? And in this situation, where presumably money damages would be very difficult to prove, C-PRE would be appropriate. Why would it not? Well, whether damages are difficult to prove, I think, goes to the question of how large is the settlement, and that's why Google settled this for a pot of $5 million rather than a pot of $50 million or $80 million. And we're not complaining that it's only $5 million. What we're complaining about is that class counsel breached their fiduciary duty to the class to put the class members first and prioritized direct recovery to the class as its obligation. But why shouldn't we defer to the district court in its determination that this was reasonable and allow for the presumption of fairness given the settlement approved by the district court? Well, I don't see why there would be a presumption of fairness when it's a question of allocation. The issue is, is class counsel favoring themselves at the expense of the class? What authority is there to distinguish a presumption of fairness applying only to amount and not to the methodology? That would be dry mats. This is a circuit case. Let's go back to the question I asked you. You're saying only if there's money left over might you have a giving of the remainder to some type of charity, charitable organization that would have some connection to the type of class action. But you look at the ALI. It talks about what happens when people have de minimis amounts that would be claims. They can't be reasonably identified, and it's just not economically viable to try to go out. You'd spend more to try to find these people and pay them the minimal amount, $5, $10, $15, $50. So just they've conceded that they should settle the other side, okay, and take the money and give it to something that's charitable that works. So if it meets the 307 criteria, that's an argument. But it didn't meet the 307 criteria here because— Well, Judge Robinson said so. Did she not? But the only evidence before her on feasibility was our declaration showing that similar settlements with similar ratios of money to class members were feasibly able to be distributed. And I think the definition of distributable is able to be distributed. There is no settlement out there that can possibly pay every single class member. So even Sullivan v. TD, where it was a nine-digit settlement, if you divide it by the 50, 70, 70 million class members, it was less than $2 a class member. And by the standard that the utilities are asking for there, it could have all gone to side change. Do you agree that it's extremely difficult to determine whether someone has had the cookies placed pursuant to the method and in the manner alleged in the complaint? I would agree to that, but I would also say it's irrelevant because that's not the class definition. Oh, yes, it is. It happened as per the manner set forth in the complaint, is it not? No, because as per the manner set forth in the complaint modifies the word website. And that's Appendix 6. And the list of websites that distributed cookies in that manner is a known quantity. And so the class definition is people in a certain geographic area of the United States that use certain browsers, Safari, Internet Explorer, that visited certain websites at certain times, are all members of the class. So that, I think, is readily determinable. Now, whether it meets city-select auto sales, I think that's something for the plaintiffs to address. But I think it would be feasible to have the sort of declaration that the objector is here. Well, we may even have an argument as to what the class definition means by the time we finish litigating that. Well, if the class definition is indeterminate, then that's also an argument against class certification. I do want to address your second question because I didn't get a chance to get to it. But if it is the case, as Google argues, that it's impossible to determine who's in the class, then that means that neither the objector but also neither the class representatives are class members and have standing, and that's Hayes versus Wal-Mart, 625.3749. And at 760, it cites multiple Supreme Court opinions, such as Schlesinger and Bale, that the class member has to be a member of the class and have standing. But under your class definition, we could determine who's in the class. So you're arguing a little bit against what you just said. Well, I was answering the question that the court proposed, which is if Google is correct, what does that mean for the class representatives? And I think they didn't say it's impossible. I think they said through highly technical means. But that would suggest that would not meet the House Sustainability Standard, not of cities. Are you going to argue the issue regarding Mr. Strange and the designation, or is that for your co-counsel? My co-counsel is going to argue distributability. I'm happy to argue the conflict of interest, because even under Google Refer, you have a class counsel that's providing money to the charity where he's chairman of the board. And I didn't mean to limit it to Mr. Strange. It's really the overall conflict issue. Right. And we fully agree with those. I stand by those arguments. I'm happy to answer any questions you might have about that. I assume you would say that, unlike in the Ninth Circuit, the district court's scrutiny was insufficient. Well, the Ninth Circuit didn't follow baby products, so I don't think that opinion is applicable here. But the real issue here is if class counsel giving money to his own charity isn't a sufficient conflict, what could possibly be a sufficient conflict? Now, the ALI doesn't necessarily agree with that. It could be, but sometimes the industries are such that there are so many interconnections that that's the only option you have, and you just need to pick out the ones that there isn't a significant conflict. Now, the ALI uses different words, but essentially there isn't a significant conflict. Well, the ALI goes farther than even the Ninth Circuit would, because they specifically single out alma maters as the type of conflict that's problematic, whereas the Ninth Circuit shrugged about that. Well, I'll just give you an example there. I mean, if you're on a committee or a board of that alma mater, that may be a problem. If you happen to graduate from there and you don't really give any money to the place, for example, that would be the other end of the spectrum, why would that be a problem? Well, because you're giving money to benefit yourself rather than to give money to benefit the class. But we don't have the alma mater case here. I mean, the one you normally think of is even though you haven't previously given money, you're doing that because you have a child or grandchild that would like to go to that alma mater. You might have that, or you might just want the side benefit of being named, being hired, when Stanford singles out the law firms that gives them side credit. So you may want that association. But what is a significant prior affiliation? I'm thinking of it as a conflict, but what does that really mean? That's the ALI words. I think it means anything that goes beyond a conflict, but something that might be perceived as a possible conflict. So I think it has multiple elements. It's a question of whether class counsel is trying to benefit themselves at the expense of the class, or in the case of the defendant, whether the defendant is just moving money for accounting purposes to create the illusion of relief because they were going to give a lot of money to Harvard and Stanford anyway. And now it's being called class action settlements, but it's not really costing them anything. If the court scrutinized the circumstances of the selection process and the merits of, maybe this is the preeminent entity that would be really capable of doing this, shouldn't that sway the determination as compared to it might look like he's preferring his college? Isn't that really what it has to be about? Well, no, because you also have to look at whether there's actually new money coming in, and that never happens. There was no evidence, and they have the burden of this, that Google was not just shifting funds around, that there was new money coming in, that there was a marginal benefit from the settlement, that Google was giving more money to these organizations than they would have given anyway. Don't we need to take account of it being a limited universe? I mean, that's one of the points that Google Refer makes when we're talking about electronic privacy, and for the funds to go to good use, to be effective for the interests of the class. A failure to diversify may be, as a common sense matter, appropriate to effectuate the interests of the class. I mean, if it's really the case that Google is giving to every single privacy-related organization and has that significant higher interest, but even then, I doubt that that's true, and there's no evidence of that, but even if it were true, they can still give money to the government. It mischeaps you. So there's always that option that avoids the significant higher interest and avoids any question of the privacy. But how does this cheat really help? I mean, a cheat means, okay, the state, whatever state it might be, California, whatever, gets something that they never even had no nexus to this case. They have people in California that are putative plaintiffs, of course, in the class, but that's it. So why should it as cheat to just one state when you've got people in 50 states? It doesn't better serve the interests of the class to go to a preeminent organization that addresses specifically the interests that are at issue in the lawsuit. If there's no significant higher interest and if the court can be sure that it's actually new money and not Google redistricting money that they're using. But you're losing sight of the purpose, as Judge Crouch points out. You're trying to benefit the class by having these organizations do something. If it cheats to the Treasury, you've lost that possibility. Well, it's an indirect benefit, and that's why the side price should always be at last resort. The ALI standard is not merely that there's a prior significant affiliation, but a prior significant affiliation that gives rise to a substantial question about the allocation being on the merits. And that is absolutely correct, and we agree with that standard, and I think there is that substantial question here because it's actually been raised by journalists. Roger Parlock wrote about this exact problem and identified Google giving, and Facebook, giving money to the same charities over and over and over in side price settlements that they have these relationships with and then go on and lobby for these organizations for Google's and Facebook's interests. Well, isn't that just to say, as the advocates to vendors have urged, that there needs to be scrutiny on the part of the district court making that determination. But again, that's something that fundamentally rests in the discretion of the district court in weighing the myriad interests around how many folks are in that particular market, their expertise, their preeminence, the nature of the affiliation, how direct or indirect it is. Isn't that something where a substantial discretion needs to be afforded to the district court? I would disagree. I think you need a bright-line rule here because there's always going to be incentive to try to shade this, to try to cheat the system, and the district court's always going to have the incentive to say, I want this case off my pocket and let's just approve the settlement. So you need a bright-line rule because otherwise it's just too easy. The district courts, they're used to adversarial presentation. They're not investigators. And to ask them to investigate puts them at a disadvantage and puts the absent class members at a disadvantage. And if you have a bright-line rule, you avoid the problem in the first place. I have some questions relating to the Ninth Circuit decision that you participated in, but I'll get you back in rebuttal on those. Let's hear from Mr. Skinner, please. Yes, can you? We're going to put a new mic in, just because it's you. Thank you. All right. Thank you. We'll see if that works. All right. You want to do a testing? Which mic? Are either of them working? No? That sounded good. Now say something. Yeah, that one. Perfect. Thank you. That did it. Thank you. Is this adequate? Yes. Judge Ambrose, may it please the Court, my name is O.H. Skinner. I'm here from the Arizona Attorney General's Office to speak. You're going to have to speak a little bit more loudly, sorry. My name is O.H. Skinner. I'm here from the Arizona Attorney General's Office to speak on behalf of the State and NICI who are involved in this case. This settlement approval cannot stand under any fair reading of baby products. There's a procedural failing in that there is no direct benefit to the class at all from the settlement. There's also procedural failings to the extent that the Court did not apply the appropriate standard or conduct the required analysis that baby products set forth for these specific kinds of settlements. So your primary argument, is it on the merits or is it procedural? It starts with procedural to the extent that baby products added a specific inquiry into the direct benefit for the class and then instructed different courts. You've got to explain it yourself. Not you, the Court does. Thank you. Yes, the Court has to explain themselves, but they also have to look to the direct benefit. When they do that, they must look to the actual, you know, the words are practical, I think fair reading is a practical search analysis of the real world implications and possibilities. And they need to, baby products go so far as to say that if that material isn't readily available from the parties, that the District Court is to affirmatively seek out that information, analyze it, record it, and then make a determination that SIPRE is worthy because of the direct benefit as opposed to the SIPRE allowance. So if there were more specific findings under those circumstances, would you afford the possibility that a SIPRE-only settlement would ever be permissible? Standing here on behalf of this group of amici, yes, it is possible. We think that when you look at a case like this where there's millions of dollars available, it appears that it is distributable on its face. There are certainly other cases that have demonstrated distributability on similar enough facts, and that it would be the proponent's burden to come forward with enough material to demonstrate that notwithstanding the millions of dollars, notwithstanding these other cases, it was truly factually for specific reasons in this case not possible. And then if the District Court made findings to that regard and cited record materials and submissions, there's always the possibility that a 100% SIPRE case— Assertion that it's not realistically possible to identify the class members. Doesn't this come as close to impossibility as we might see? I defer to Mr. Frank's arguments regarding the contours of the class as alleged, the class as settled. I think he addressed that well where Google's position now is that it is impossible to find a class, but there is a class that has been defined. There's content that the class representatives are members of that class for purposes of settlement, and so we believe that to the extent the class members, the class representatives here have standing, and that means that this is at least strong evidence that there's an ascertainable class here that Google and the plaintiffs can find. But baby products was a totally different situation. I mean, there we said there was a troubling and surprising allocation issue, that the people who were getting $5 were nowhere near being compensated, and the court didn't realize that when it approved the settlement. Here we have nothing like that. We have—everything is fairly known, and there's nothing that was surprising or that the court lacked a factual basis regarding that's similar to baby products. It's a different case, is it not? We believe that there are differences, but that no fair reading of baby products would allow something like this, where the district court made a determination, made no factual findings or conclusions, and where all the district court did is say, I confirm there is zero direct benefit. Cypre should be allowed in this case. What was the district court to have done here? What should she have investigated? We believe that the district court should at a minimum have asked the parties what the costs of data distribution were. There's a notice— Isn't it kind of obvious that there are so many people in this class? I mean, I think everybody in this room could be in this class for having access so far. I firmly believe that baby products specifically instructs that you must go beyond the it's obvious explanation. If you look at a case like Fraley, for example, the parties came forward and said there's 150 million people in the class. It's obvious you can't distribute it. The district court there, as courts should do, properly showed skepticism and said, you need to go back and explain to me why. And 100% Cypre is not appropriate. And the parties, no surprise, came forward and said, we've crafted a way to get millions of dollars to members of the class. And indeed in baby products, when it was sent back down, the district court said, explain to me how it's not possible to get more money to people. And over a million more class members got a distribution. But the district court here did make findings that there were substantial problems identifying millions of potential class members, that distributing money directly to them would be, quote, logistically burdensome, impractical, economically infeasible, resulting at best with direct compensation of a de minimis amount, et cetera. I mean, the district court did make findings of that nature. Are you arguing that there are some other set of findings, or there have to be numerical or financial calculations to satisfy the threshold? We believe that those statements do not deserve any deference from the court because they, as a first matter, apply an inappropriate standard. They cite to the Ninth Circuit and they talk about burdensome. And whether something is hard to do is not the standard here. It is whether it is impractical or impossible. Secondarily, we don't believe that a naked statement— This does seem impractical, but, I mean, we've touched on that with Mr. Frank, And I'm happy to address any of the same questions you might have. We're speaking on behalf of the interest of the absent class members here, and I'm happy to discuss it. To the extent that there is a second component here, where a naked statement that this is impractical, we don't believe that that is adequate. We believe that you need to, especially under baby products, where it says you're supposed to engage in an affirmative reach-out to find information, that you need to cite something in the record, you need to cite the cost of distribution, you need to—otherwise, a case like Fraley where you walk up and say there's millions of dollars but a lot of people, you need to explain why, in this particular case, it is not possible to get any money to the members of the absent class. I agree with Your Honor that it is different than baby products, but in baby products, you are dealing with a case where some people in the class are getting money, but not enough money. But that's not the test. I mean, the test is, is it highly impractical to get the minimum amounts to, in effect, almost the entire population of the United States? And you're left with, what, three million-some dollars? It doesn't make sense. Anyway, we've covered that ground. Is there anything else you want to add in about 30 seconds? Sure, Your Honor. At base, we believe that the district court here failed to conduct the proper analysis, failed to apply the appropriate standard, and did not have before it a necessary basis to approve a 100% side-price settlement. It would be different if it were not a 100% side-price arrangement. In baby products, the court remained on those two bases, the analysis and the lack of a sufficient basis, and we believe that this court should do the same. All right, thank you very much. Mr. Strange? May it please the Court. Good morning. Judge Robinson was very familiar— Your Honor, Brian Strange for the plaintiff class. I have a preliminary question. What does this case add to the FTC action that occurred prior to the settlement in this case? I mean, the FTC action was to do what? What was the intent there? The intent of the FTC action was to pursue violations of the FTC consent decree by Google in the Buzz case. But they wanted to stop it. Correct. Stop the placement of the cookies in the way that was being done. Correct. And they wanted to punish them. And so what does this case add to that? Well, it's different parties, Your Honor, different claims, and the plaintiff class— Well, the FTC case, I mean, the parties would be everybody in the country, and we're hearing from the other side this is essentially just about everybody in the country is affected. So what does the FTC—or what does this action really add to the FTC action? Well, this action provides indirect benefit to the plaintiff class, which was not compensated in the FTC action. But the only thing that's really being compensated here is not the plaintiff, so much the class. It's the counsel, you, and it is the CyPRI recipients, correct? Well, if the CyPRI recipients have a sufficient nexus to the class so that there is an indirect benefit, then the class is being benefited. Let's go—what are the connections of the CyPRI? There's, what, six recipients here? Correct, Your Honor. So what is their nexus? What is their connection to this particular tax action? Have they taken positions in the past that we have to protect privacy? Have they taken positions, for example, that the placement of cookies should be done very carefully in a way that there isn't an intrusion onto people's privacy, et cetera? Your Honor, each of the recipients is involved in data privacy and Internet issues. And, in fact, the Stanford Center, which was one of the recipients here, was noted in the Google Referrer case as their study was seminal in helping the FTC obtain their $17 million fine regarding Google's conduct. Can you be specific about public citizen? I went on the website, couldn't find anything at all having to do with any— Public counsel, I think. Public counsel, sorry. Public counsel, on which you chair the board. I couldn't find anything there that would lead me to believe they have any involvement at all in Internet privacy. Public counsel has a specific program regarding data and Internet privacy that the funds are going to go to, Your Honor. What is that program? It's a program that they've involved—I can't remember exactly, but it was something that they put together prior to this case that investigates how to protect consumers. Excuse me, Your Honor. And how much revenue is expended on that effort on an annual basis? By public counsel? I don't know. I don't know, Your Honor. Looking at the website, it looks to me like they were pursuing justice for the disadvantaged in a way that had to do more with education and the schools than Internet privacy. They do, Your Honor, but that's one of—they're ever-changing. They work on DACA, they work on protection of immigrants. This depends on what the current issues are. And one of the issues they're working on was data privacy and Internet security. What do we do with the fact that that's, at least on the face of it, an organization that deals more generally with helping the disadvantaged? To the extent there's any focus on electronic privacy, that's a program that was set up shortly before this lawsuit. It's not an area where there's a long track record or nationally renowned expertise in the area. And that you, at the relevant time, were chair of the board. Aren't those things that the district court should have explicitly considered and addressed in weighing whether the public counsel was an appropriate CPA recipient? Your Honor, I think the court did consider it. I mean, first of all, I'm no longer chairman of the board. It's only for one year. And so the 70 board of directors that volunteer their time are requested. So at the time this settlement was negotiated, I wasn't chairman of the board. I'm no longer the chairman of the board, but obviously was. But I bet they still love you, don't they? Well, I hope so, Your Honor. I try to do my time. By the way, the reference to it being my charity is sort of off base. I mean, it's a volunteer organization that I help with with other lawyers, and it's not the only organization I'm practicing. But I think the gist of Judge Krause's question, which leads to something that's troubling me, there is so little content in the district court's opinion. In fact, this is, in my 17 years, this is the shortest opinion approving a class action that I have ever seen. Your Honor, on the issue of public counsel that you raised, I did file a declaration with respect to the final approval outlining, when the issue was raised about public counsel, outlining the fact that I have no financial interest. I volunteer. But the point is the district court didn't mention that. It didn't say, wait a minute, public counsel is okay because. There's no, there's nothing after the because. And the declaration doesn't talk about the involvement of public counsel in data privacy. That's correct. There's nothing about that. That's correct, Your Honor. Well, I think that at some point, the court in reviewing these cypre recipients has to have some discretion to determine what investigation it should do. No, the court has to have some discretion, but also has to explain that as part of that discretion. I mean, for example, just to digress for a second, on 23B, I mean, there's like B2, four sentences, usually goes several pages of analysis as to the cypre recipients and the claim that there was prior substantial affiliations or, i.e., conflicts, just conclusory statements. Why does this not just call for a remand to give the court, and I realize Judge Robbins is not there anymore, but to give whoever it is that's going to replace her a chance to lay out. You may have a good case, but it wasn't made in what we've received so far on the record. I understand, Your Honor. The cypre recipients that were involved in this case, their Internet presence was known. They've been fairly well compensated in other cases, so the judge was aware, for instance, in the Lane v. Facebook case, of those particular recipients. So I think based on the law and based on the facts, that the court would have discretion to not question. What facts support it? Give me the facts that are not in the opinion that you think support what was done here in terms of the picking of the six cypre recipients. In terms of the picking or who they are? Who they are. Okay. With respect to who they are, each of the recipients is designated, and I can go over them, and have specific public involvement in Internet privacy and security, and I can go through each of them that are mentioned in the opinion. But there also are organizations where there is some prior affiliation with counsel, where there has been repeated contributions, donations that perhaps would have happened anyway from Google. Again, doesn't that go to considerations that the district court needs to address in the first instance to ensure that there is not only not an actual conflict, but also not an appearance of a conflict, an appearance of impropriety where the district court is lending its imprimatur to the settlement and to those awards? Yes, Your Honor. One of the issues that I was going to mention is, for example, in the Refer case that just came out regarding Google, the court mentioned the fact that there's sort of a limited sphere of these companies that are involved in data security and Internet-related issues. And so that's one of the things that we were faced with in terms of, you know, designating the Cypre recipients. The court … Well, we don't know that. That's not part of the record, that there was a limited number. And the Ninth Circuit case talked about a number of factors, nature of the relationship, timing and recency of relationships, significance of dealings between the recipient and the party or council, circumstances of the selection process, merits of the recipient. All of these things were mentioned by the Ninth Circuit as things that need to be considered, and we don't know that they were, do we? Well, I think based on the record, Your Honor, based on the fact that there's public descriptions of these companies, that it would have been within the judge's discretion and knowledge about what kind of business they were in to make them the appropriate Cypre recipients. You know, that's based on the majority opinion of the Ninth Circuit. What if we had adopted Judge Wallace's dissent analysis, that you need to have a more searching inquiry as to whether there are these substantial affiliations that should preclude or might preclude someone from receiving a Cypre distribution? Well, here, Your Honor, the court, there was an objector, one objector, and the objector, Mr. Frank, is very capable, and he pointed out the fact that Google made other contributions to these various entities and that I was the chairman of the board. The court was aware of those facts. And you may prevail. That's not my point. My point is that I don't know why the court made these conclusions. I don't know its rationale. And doesn't that call for a remand? Well, certainly it's one of your options, Your Honor, but I just think that in a situation where the court is familiar with counsel, familiar with the record, it's getting into a situation where I think it's here more reasonable to rely on the judge's discretion. Do you agree we should be concerned with the appearance of impropriety as well as actual impropriety in conflicts in an award? I think the appearance of impropriety is, you know, appropriate, obviously, and under the federal rules. I'm not sure if it's here how you really apply that standard. How about the ALI standard? Well, in terms of the significant prior relationship, I think what the Google Court said is, look, just because there is a prior relationship doesn't mean it's improper. But that's not the ALI standard. It's a significant prior relationship that would raise substantial questions about whether the selection of the recipient was made on the merits. Correct. So with that element as part of the standard, do you disagree with that as an appropriate standard in assessing a CPRA recipient? No, I think that's an appropriate standard. It is inappropriate or inappropriate? No, I think it is an appropriate standard. I do agree with that. If Your Honors have any other questions, I'm happy to answer them. I'm not sure whether you want to address the two questions raised by the person in your letter. But, I mean, obviously Google, in that brief, says you can't identify these class members. We were working on that, but it's extremely complicated and extremely expensive. And I think, lest us not forget, that most of these data privacy cases were dismissed out of hand because there's no damage. It was not until this Court's decision in this case that held the injury, in fact, with no economic injury, is enough to have standing in these cases. It's a very important decision in the data privacy area. Mainly because of the statute. Right. But when we came back down to the trial court, we didn't have any statutory claims, and we didn't have any claims. This Court dismissed our California claims because there's no allegation of damage, which we didn't have. So all we were left with was the California right to privacy under the Constitution. And the tort claims and damages there are extremely difficult. The issue would be whether there's nominal damages. But you did ask for compensatory damages, right? We did. Just out of curiosity, was there consideration by the Court of dismissing the case for lack of jurisdiction at that point? No, Your Honor. Not taking penitentiary? No, Your Honor. One other point with respect to the FTC claim, is this Court did note that in its decision in this case and say that the fact that those claims were brought by the government helped in this Court. The Court said it was highly relevant in determining whether there's offensive conduct under the privacy claims. Thank you very much. Thank you, Your Honor. Mr. Rebell. May it please the Court. Good morning, Your Honors. Anthony Rebell for the Defendant Appley, Google. I'm delighted to have this morning. Just to explain my question, what information did you provide to the District Court to show why Google's relationship to the Cypher recipients did not affect the fairness of the settlement? I think the information that we did provide, there was testimony, not testimony, there was attorney argument, and I know there's some question about that. But there was certainly the judge took judicial notice of the fact that Google is a very large corporation and that the people who were involved, and this was the argument before the District Court, the people who were involved in approving the CyPray recipient list are not the people that make determinations as to other charitable gifts. And that there was no, there's no, because it's a very large corporation, there's no conscious decision to withhold money from a subsequent charitable distribution because somebody was a CyPray recipient in the past. Also, certainly in this case, right, where one of the CyPray recipients is the very organization that uncovered the problem that was the issue here at the heart of this case, that was, in other words, Google isn't going out wanting to give money to people that are, you know, putting it under a microscope and calling it out and sending the FTC to knock on its door. Right, so this was a very limited organization with a very specific research aim to protect data privacy, to scrutinize the things that Google and other companies were doing. And so there, with that record before the courts, I think it was very reasonable for the courts to make the finding that the court did, right. If we adopt, you have a question, go ahead. I was going to say, do you agree that the determination of who is in the class would be, as Mr. Strange said, extremely complicated and expensive? I'm confused as to what, in your brief, you say it varies between impossible and highly technical. Could you give us your best statement as to how difficult this is? I think, well, personally, I think it's impossible. And Google's position all along has been you can't, there's no way to identify who is in and who is out of the classroom. In other words, who... How about the named plaintiffs? Well, our position all along has been the named plaintiffs probably were not. In fact, if the next step in litigation, if this case had not settled, we would have had extensive litigation over that issue. Whether or not they had actually been affected by this conduct, we would have brought in experts, the plaintiffs would have brought in experts. But we don't know that sitting here today. Exactly. That process didn't happen. Exactly. Well, to the extent we consider a remand, should we be considering a remand in scope that includes the appropriate certification of this class? That is, with questions that we received from Judge Ambrose and questions about the nature of the award here, doesn't it seem in many ways to be an end run around the requirements of a B3 class? Getting injunctive relief only by certifying it as a B class, but in reality... B2 class. I'm sorry, B2 class, but in reality, providing a damage award, but a damage award that is not premised on, for example, ascertainability, and where the funds are not going to the class members, but instead to counsel fees and to recipients that have been selected by their respective counsel. I think there are a few questions embedded in that question, Your Honor, so let me pick them apart and take them one by one. First, I think it's important to back up to where we are or where we were when we reached settlement. So this case, even if the allegations have been proven to be true, the effect on those who had been affected was that they would have seen or may have seen ads as they were browsing the Internet that were more relevant to their interests or more relevant to their prior browsing history than the ads the other advisers would have seen. That's it. The plaintiffs did not allege any facts to show damages. This court recognized that on the appeal, that there was no pecuniary injury. It was solely whether the invasion of privacy generated enough injury to give them standing. And then there were no statutory damages after the remand. And so what we were faced with, or what they were faced with, was the possibility of maybe, at the end of the day, getting injunctive relief if they had prevailed on their claims. And so we went into the settlement with the very unlikely possibility that there would ever be any damages. And we said, well, why don't we do this? We will guarantee the class the injunctive relief they would get if they were to succeed, and we'll pay the attorney's fees in order to reach this global settlement and wrap this thing up so that we don't have to go through the expensive litigation process of deciding who's in the class, who's not in the class, deciding the standing issues, and then deciding the merits issues. Certainly Google's position is that there's no way these claims could have been proven during litigation because Google didn't have any intent, certainly, to do the things that were alleged. So there were those huge hurdles coming forward. And so the settlement gives them all of the relief they could have reasonably expected to get, and it guaranteed it. And then it threw in as this added bonus what we're calling a Cypre component. It's not really Cypre. We're just using that because money is going to somebody besides the attorneys and besides the class members, and so we call it Cypre. In effect, it's just that we're giving money to organizations who are out there watchdogging, policing the privacy issues of the class members to help protect their privacy. And that was the settlement that was reached. And under the facts of the case, that was very reasonable. Back to the question about whether you can have a class release monetary damages claims and only get injunctive relief in return. How could that possibly be fair? Well, certainly under this court's en banc decision. Especially what's already been done with the FTC, right? Right. Well, there's that, yeah. Certainly, Your Honor. Certainly, disgorgement has happened, right? To the extent Google could have profited from this conduct, that was many times over-discouraged. And injunctive relief has already happened. Certainly, exactly, Your Honor. And our position all along was that the class couldn't add anything more to this, or the plaintiffs couldn't add anything more through the civil action. But what they did get by the settlement is, they now have the contractual right to enforce the injunction that they didn't have before because of the settlement. And then they also get this added benefit going to the privacy watchdogs. But the Sullivan case recognized, it's not obvious, but there was a huge component in the Sullivan case of class members who were exchanging their monetary claims and getting nothing in return except for injunctive relief. If you recall, there was a minimum threshold in that case for a $10 claim. And so anybody who couldn't meet that was essentially trading in their monetary claims for pure injunctive relief. There's also the other cases cited in our brief, the McDonough case and the Bolger case, which both involved pure injunctive relief going to the class members and them getting nothing but injunctive relief. And in both cases, the court recognized that's appropriate where damages are unlikely. That's certainly this case. Again, damages really weren't on the table at all, especially after the remand from this court during the first round. And so we were looking at, let's wrap this whole thing up, give the class everything they would have gotten at the end of the day, if they could even prevail on their claims, and give them something extra, and then everybody gets to go home. That's certainly within the spirit of the Sullivan v. DB case when it talks about reaching global ease. And applying the ointment, as though, is one objective. Exactly, Your Honor. But there has to be a way to settle these kinds of actions without litigating these very expensive issues that the class is facing in this case. Thank you very much. Mr. Frank? You have six minutes. Instead of nine minutes, we gave you 20 on your opening, so we're going to stick to the six. Thank you, Your Honor. Two points. First of all, with respect to the cypress election, the settlement called for class counsel to propose 10 names and then Google could veto. We don't know who Google vetoed. We don't know why they vetoed them. We don't know... I mean, there's a lot about the selection process that's just simply not in the record in that regard. And it, I think, shows that there are more than six possible recipients, especially in the case of public counsel, which has never been named in any other Google or Facebook side prey, but happened to show up in this one when involved a class counsel who was affiliated with the organization. New proof on class action suggests that, particularly in a CPRE-only award, that a better practice might be to identify recipients in the class notice and have them identified prior to preliminary approval. Are you aware of any court that has adopted that? And what is your assessment of that approach recommended in the book? Well, in Baby Products, we complained loud and hard that we didn't know who the side prey recipients would be and were told that it was okay for courts to decide that later and then let the class complain about it. But that was not a CPRE-only award. That was not. That's true that that was not a CPRE-only award, but we knew that there was going to be eight digits of CPRE in that case. I'd be happy if this court went to what we proposed in Baby Products and required the class to be notified. And I think one of the things the class was not notified of was Mr. Strange's relationship with public counsel, Google's relationship with these organizations. While we ferreted some of that out, we don't know what we didn't ferret out. We asked the parties to make affirmative disclosures, what the relationships were. The court didn't require that. The parties didn't volunteer it. It was never there. Now, if the argument is that class members have to conduct discovery every single time there's a CPRE to find out what wasn't disclosed, there's going to be a lot of wasteful discovery. I think the better rule is have that bright-line rule and require the disclosure up front. Do you have a view, or could you expound on whether you think this should have been a B2 or B3 class action? I think this should have been a B3. Because? It was waiving damages claims. There was an opt-out. And as the court suggested in its letter, the injunctive relief was essentially moot, and that's new motor vehicles for a First Circuit 2008 case. We talked about that in light of the FTC action. I'm sorry? We talked about that in light of the FTC action. Right. I want to get to the suggestion that the court made a factual finding that there were so many class members and, therefore, it's okay to not distribute to the class. And the reason that doesn't deserve deference is because it's the wrong legal standard. In every class action, it's always going to be impossible to distribute to every single class member. You're always going to have class members you can't track down, except in very rare, rare situations. There are always going to be class members left out. There's always going to be some sort of claims process. But in this case, what would you estimate would be the number of class members? In the tens of millions. Maybe hundreds of millions. It's possible that the class is as large as it was in Fraley, where there was a distribution and still money left over. So why is that not something so practical that you believe? Because, as we demonstrated at Joint Appendix 183, 184, you can make these sorts of distributions. And as a matter of law, in Pearson, there was $1.1 million left over, 13 million class members. By definition, that's impractical to distribute that to all 13 million class members. The cost of giving each class member $0.08 would exceed the $1.1 million in the first place. But that still wasn't good enough. There was a way to distribute that money to class members. So you're saying the determinative factor is, if it can possibly be done, then that renders a settlement that does not provide for a distribution to be unreasonable and unfair? Yes. Wow. That's a pretty strong position. I think we back it up in our brief. Class counsel has a fiduciary duty to the class, and I think that was what was recognized in baby products. Prioritize direct recovery to the class. I took a fairly strong position in baby products, but not that strong. Well, I think our characterization is the correct one, because the incentive is always going to be to prefer the charity. Handing over a million-dollar check to a charity is just going to have much more psychic benefit to a class counsel than distributing $200,005 checks. And if you do not give class counsel the incentive to prioritize direct recovery, it's just not going to happen. And if the standard is too many class members, impossible to distribute to every single class member, you're giving carte blanche to have the class counsel testify, oh, 8 million class members, we settled for 5 million. Even though we know that there's only going to be a 1% claims rate and we could be giving out $50, $60 a class member, we're going to do it to all-side credit because I'd love to be honored by my alma mater. Now, they won't say it like that, but that's going to be the ultimate result. Happy to answer any other questions the Court has. Thank you very much. Thank you. Thank you to all counsel for a very well-presented oral argument, and we'll take the matter under advisement. Thank you for being with us today.